# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| THOMAS E. GIBBONS,<br><br>    Plaintiff,<br><br>    v.<br><br>JP MORGAN CHASE & CO.,<br><br>    Defendant. | No. 04 C 5368<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

Plaintiff Thomas E. Gibbons filed suit against Defendant JP Morgan Chase & Co., alleging that his firing was the result of discrimination based on his age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et. seq.* ("ADEA"). Defendant now moves for summary judgment in this age discrimination case. For the following reasons, Defendant's motion is granted.

**Facts**

Thomas E. Gibbons worked for Bank One, a subsidiary of JP Morgan Chase & Company. He had a long career in banking. He spent 23 years at Continental Bank, followed by employment at NBD Bank – a predecessor of Bank One – and, in his last 5 or 6 years he worked in Bank One's Estate Settlement Unit ("ESU"). ESU did the customary work of acting as executors or trustees or agents for executors with respect to decedents' estates. Gibbons was 62 when he was told his job was being eliminated and 63 when he was terminated. He was the oldest employee in ESU.

Gibbons reported to John Pickford, the manager of the Chicago ESU. Pickford in turn reported to Linda Salton, the national estate administration manager. Salton then reported to John Taylor, the head of the bank's trust department and CEO of Bank One Trust Company. Gibbons himself was a Vice-President and Senior Estate Administrator, and did the traditional work of such administrators. He met with decedents' family members and attorneys to discuss estate issues, gathered financial records and estate assets, determined and paid what the estate owed, reviewed tax planning and prepared returns, distributed assets to beneficiaries and sold assets and closed out trusts and estates. In 2002 he was one of twelve estate administrators reporting to Pickford (Pickford also dealt with employees who did guardianship estates and those persons whose work supported the Administrators' duties). Later that year, as part of an effort to reduce costs, Taylor ordered Salton to cut the number of full-time employees in estate administration. Salton worked with unit managers, like Pickford, to identify positions to be cut. Salton told him to eliminate one position from Chicago ESU.

Pickford worked with Bank One's human resources department to understand how he was to select the employee whose position was to be eliminated. He was advised to use a prepared chart with performance criteria (five, but not all, of these were the core employee competencies used in performance evaluation) to rank performance and, after he had done this, to select the employee with the lowest performance ranking. Pickford consulted with Delana Rippley, his contact person at HR. She gave him a chart with particular criteria already entered and told Pickford to rate each employee for each criteria on a scale of one to four. No one knows who chose the criteria. Rippley may have provided them to Pickford but she did not devise them.

The criteria were un-weighted in relation to each other and one, the seventh, was not actually used in the decision process.

These criteria were, almost entirely, the same as those used for the annual evaluations. Rippley believed that the ordinary core competencies were used because job elimination was to be based on performance. She told Pickford to consult his performance evaluations. Rippley believed the job elimination evaluation should be made in light of an entire year's performance rather than performance at the very moment the evaluation was being made.

Pickford, in fact, was responsible for evaluating the performance of Gibbons in the ordinary course of work. When doing the annual performance evaluations, he relied on his observations and, in his work as the manager, informally consulted with team leaders in the ESU about how the administrators were doing. The routine annual performance evaluations cover five core skills: focusing on customer service, teamwork, attention to quality results, integrity, character and courage. The scale ranges from "needs improvement" to "exceptional." There is nothing novel in any of this. Nor is there anything novel in the fact that Pickford was not absolutely certain of what Bank One wanted him to rate under "courage." There was nothing improper about his interpretation of it to mean willingness to take the initiative.

In his 2001 year-end review, Pickford found Gibbons to be "meeting expectations" and rated teamwork and courage somewhat better than meets expectations – marking a point on the performance range past the midpoint and towards the higher end of the scale. There were younger employees whose ratings were, while decent, slightly lower than Gibbons' on teamwork and courage. There is a dispute over where the rating marks are actually made on the performance range graphic but, for the purposes of this motion, I accept that some younger employees did

slightly worse in teamwork and courage than did Gibbons. Pickford does not recall whether or not Gibbons' performance declined or improved after 2001. The same phenomenon occurred in the 2002 ratings. Some younger employees were rated somewhat lower than Gibbons in teamwork and courage.

Pickford does not recall actually looking at prior evaluations or consulting team leaders. He thought that all of his administrators did a good job to different degrees and did not want to eliminate any of the positions, but he followed the directive and completed the chart. He simply sat and completed it in less than a workday and did most of the chart from memory. Pickford started with one criteria, completed that criteria for each employee and then moved on to the next criteria. He based his rankings on the relative strengths of the employees. The result was a surprise to Pickford. The employee that he thought would have the lowest score came in at 18, but Gibbons had the low score of 17. Gibbons' lowest scores were on team work and courage. He scored lower on both of those measures than any other employee.

Bank One did have a written policy for selecting employees whose jobs will be eliminated. It said that job skills for the un-eliminated positions should be analyzed and matched against the skill of the "affected" employees. It also specifies that, if appropriate, these skills can be weighted in order of relative importance and these weights can be used in ranking. Pickford does not recall whether or not he consulted this policy before he reached his conclusion about Gibbons. Pickford's ratings were, on this record, honestly made. He did testify, however, that he was happy that the chart was making the ultimate decision for him, as opposed to his having to make it himself. Pickford told Salton the result of the scoring, and she then told him to inform Gibbons that his position was being eliminated. Although Pickford was not specifically aware

4

that Gibbons was the oldest person in the office, he may have believed Gibbons was probably the oldest.

Pickford met with Gibbons early in November, 2002 and gave him the bad news that his job was gone as of the end of the year. Pickford told him that he was good, but poorer than all the others. Gibbons did not concede this point. Bank One paid Gibbons' salary and benefits for a month and a half after the end of the year. After the month and half passed, Gibbons started working for LaSalle bank as an independent contractor and became a full-time employee there by early June.

Gibbons does not think his new job is inferior to his old job, and sees it as having the same responsibilities and "more prestige." When Gibbons left Bank One his salary was a notch above $79,000 with a contingent bonus of about $5500. His salary is better at LaSalle, at $85,000 and a non-contingent bonus of $7500 for the year 2003. However, Gibbons does not vest in LaSalle's pension benefits until he has been employed for five years. This is the only potentially serious element of a damage claim.

At the same time Pickford told Gibbons that he was out of a job, he also told him that, if there were to be an opening in the future, he would hire him back. This is not surprising, given his view of Gibbons. In early 2003, Bank One's management changed and Salton was authorized to hire an estate settlement officer. Bank One says it offered to re-hire Gibbons into the same position he held in 2002.[1]

---

[1] Gibbons says there was no job offer, it was a settlement offer made to his attorney and Bank One did not directly convey salary, benefits and other conditions to Gibbons himself. If the disposition of this case depended on resolving a material conflict here, this disagreement would preclude summary judgment, but it is difficult to see how there is a material conflict in this case. Gibbons had a lawyer and I doubt that Bank One would have been within its rights to contact

**Standard**

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-33 (1986). A genuine issue of material fact exists when there is evidence on the basis of which a reasonable jury could find in the plaintiff's favor, allowing for all reasonable inferences drawn in a light most favorable to the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The movant must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

The ADEA prohibits an employer from "discharging any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1) (2003). To establish a claim under the ADEA, Gibbons must show that his age "actually motivated [Pickford]'s decision;" *i.e.*, he must demonstrate that his age "actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (internal quotation and citation omitted). Gibbons may prove his claim through one of two methods; in this case, he relies on the indirect method articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, Gibbons must

---

Gibbons directly. Even if it had the ability to do so, no negative inference can be drawn from the fact that it declined to deal directly with an employee represented by counsel. Gibbons does not assert that his lawyer was not informed of pay and benefit. Nor does he assert that he was unaware of pay and benefits.

establish a *prima facie* case of discrimination; if he is able to do so, JP Morgan must articulate a legitimate, non-discriminatory reason for terminating or failing to transfer him. *See Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 472 (7th Cir. 2002). If JP Morgan meets this burden, Gibbons must "muster sufficient evidence to convince a rational jury that [JP Morgan's] justifications were pretextual." *Id*. at 472-73.

**Analysis**

The fact that Pickford may have believed that Gibbons was the oldest person in the office is the only arrow that Gibbons has in his quiver. There is no evidence of age-related comments or remarks made to Gibbons or anyone else at the Bank and, *except* for his termination (which is not a trivial event), he believes that he was never treated differently because of his age. Therefore, there is no direct evidence of age discrimination.

Gibbons believes that he was a better performer than other employees in the ESU and infers that Pickford must have taken into account whether other employees were supporting families. However, he has no direct evidence of this either. His inference is based on the premise that, given his abilities, considerations of others' families is "one way he could rate me at the bottom." This means that Gibbons can only speculate about any family status discrimination. If Gibbons can get to trial, it is only with the help of *McDonnell Douglas* burden shifting. In order to make his *prima facie* case, he must show that he was doing his job satisfactorily, his position was eliminated and someone substantially younger is doing the work. I assume that Gibbons can do this, so JP Morgan must specify a legitimate, non-discriminatory, reason for its action.

There was a facially legitimate reason to fire Gibbons. Gibbons does not challenge the decision to reduce the staff. Evaluation charts are commonly used for this purpose. Pickford used the chart and relied on it, in fact, as the sole basis for his decision. Gibbons thinks that Pickford may have made a bad judgment call by failing to use procedures embodied in bank policy, may have been given inadequate counsel about how to fill out the chart and failed to consult others in the rating process. Bad judgment is not enough to make a case. "Criticism of an employer's evaluation process, even if well-founded, is not enough to establish pretext." *Ghosh v. Indiana Dep't of Envtl. Mgmt.*, 192 F.3d 1087, 1093 (7th Cir. 1999).

The issue is whether Pickford's reasons (and hence the company's reasons) for selecting Gibbons were a lie. Gibbons thinks Pickford's judgment was wrong but there is no evidence of a reason that Pickford would lie about his judgment. There is no dispute that Pickford was not hostile to Gibbons. He did not want to fire anybody and his original view, prior to filling out the chart, was that Gibbons would not be fired.

The heart of Gibbons' argument is that an "employer's failure to follow its own internal employment procedures can constitute evidence of pretext." *Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 727 (7th Cir. 2005). Assuming for the moment that there were procedural failings, Pickford's failings are not enough to allow any reasonable finder of fact to believe he lied. Cases like *Rudin* and two similar cases decided by me involve blatant or systemic deviations from essential personnel rules or concealment of facts which underlie the decision. This case is unlike another case before me, cited by Gibbons, in which a competitive process for a supervisory position was mangled so badly that the original person given the job lacked the qualifications set forth in the job description and there was direct evidence of

8

racial/gender bias in the workplace. *Reyes v. Cook County*, No. 02 C 3920, 2004 U.S. Dist. LEXIS 12033 (N.D. Ill. June 30, 2006). Nor is this case like *Dalton v. Village of Palatine*, No. 95 C 4154, 1997 U.S. Dist. LEXIS 5140 (N.D. Ill. Apr. 15, 1997), in which the village destroyed the examination scoring sheets despite its rule requiring their preservation. Even *Rudin* itself found "systematic abandonment of its hiring policies . . . ." 420 F.3d at 723. In this case, Pickford is not concealing anything. His candor about what he did and how he did it is what enables Gibbons to even make the arguments he does.

Pickford let the chart make the decision, a fact which is not only undisputed, but also one that Gibbons relies on to make his case. Gibbons does not make any effort to show how the chart could possibly be biased against the evaluated person's age – the procedure is age-neutral. So, Gibbons must show something that would convince a jury that Pickford intentionally gave incorrect or untrue ratings. He is unable to show the kind of rationally inexplicable abandonment of regular procedures that justifies an inference of pretext.

There is no evidence that any procedural irregularities did, in fact, occur. The Bank Policy cited by Gibbons gives guidance on what is to be done, but does not mandate any particular form of weighting factors or require that the factors be weighted at all. The policy also does not require that the rater select the criteria. No rational finder of fact could conclude that the criteria used were inappropriate, because they were the same ones customarily used to evaluate performance. Indeed, the two lesser ratings that hurt Gibbons were on criteria that had customarily been used and are unchallenged here. The bank's rules do not require that a rater take into account an entire year's performance rather than the perceived level of performance at the time of the evaluation. It is true that Pickford may not have followed the advice of his human

9

relations department liaison but Gibbons has not shown that to be a violation of any binding or formal bank policy. Gibbons is left with a bald accusation that Pickford just outright lied about Gibbon's performance when he rated him.

A reasonable finder of fact would not find that Pickford lied. Personal animus is not alleged; Pickford's prior opinion about who should be fired centered on someone other than Gibbons; Pickford did not want to fire anybody and thought all were doing a good job. Nothing Pickford has said would support the notion that age (or family status) would affect his judgment. What little is left are "inconsistencies" between year-old prior rankings of Gibbons and others, and his rankings on the job elimination chart.[2] I have examined the exhibits and the differences on which Gibbons relies (tick marks on rating line where the left end is worst and the right end of the line is best) are really quite small and concern only two of the five criteria. It is impossible to conclude fairly that there were substantial and therefore probative inconsistencies in Pickford's ratings in 2001 and his ratings on the chart.

---

[2]Gibbons compares the 2001 evaluations and the job elimination chart and notes that in the 2002 evaluations of other employees, they ranked lower than he did in 2001. However, the relevant comparison would be between his 2002 evaluation and the job elimination chart. He never actually received an evaluation for 2002 because he was leaving. Pickford did not concede or even recall whether Gibbons would have been rated the same in 2002 as he was in 2001.

**Conclusion**

In my view this was one of those cases brought because Gibbons could not bring himself to believe that any reason other than discrimination could have caused his discharge. Many lawyers who bring discrimination cases follow a practice of declining any case in which the only evidence the potential plaintiff has to offer is the conclusion "given the quality of my performance there could not be any other reason for my discharge but discrimination." [3] That potential plaintiff's opinion rests on the most notoriously unreliable kind of judgment, one's judgment of one's own excellence. Gibbons has nothing more than this. The employer is entitled to summary judgment.

ENTER:

*__James B. Zagel__*

James B. Zagel
United States District Judge

DATE: January 10, 2007

---

[3] To use an example within my memory (and perhaps those of the plaintiff and the lawyers in this case) could one say that the only reason Lou Brock–a Hall of Famer–was traded by the Cubs to the Cardinals in exchange for Ernie Broglio–a failure with the Cubs–was that Brock was a member of a protected class and that this is proven because there is no credible explanation for the trade on any other grounds. Wrongful discrimination is not the only reason. The ineptitude of Cubs management was the explanation. In the context of this case, the weight of the evidence compels the conclusion that if Gibbons was the wrong person to fire, it was because of mistaken judgment and not age discrimination.